# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| TRAVIS MCEWEN, individually and on behalf of all others similarly situated, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:20-cv-00153-LEW |
| v. | ) | |
| | ) | |
| NATIONAL RIFLE ASSOCIATION OF AMERICA and INFOCISION, INC., | ) ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION TO DISMISS COUNTS 3 THROUGH 6 OF THE AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

# TABLE OF CONTENTS

INTRODUCTION & BACKGROUND ...................................................................................1

LAW & ARGUMENT ....................................................................................................... 2

I.      Standard of review................................................................................................ 2

II.     The Court should reject McEwen's "other client" allegations. ............................... 3

III.    McEwen's do-not-call claims should be dismissed. ............................................... 5

        A.      The NRA is a "tax-exempt nonprofit organization." ................................... 5

                1.      The statutory text. ........................................................................ 7

                2.      The TCPA's structure. ................................................................... 9

        B.      McEwen did not receive a "telephone solicitation" or a call made for
                "telemarketing purposes.".......................................................................... 12

        C.      Defendants did not call a "residential telephone." .................................... 16

                1.      Cell phones are not residential phones......................................... 16

                2.      McEwen's allegations fall short even if some cell phones may
                        be deemed residential phones. ...................................................20

CONCLUSION .............................................................................................................20

## INTRODUCTION & BACKGROUND

Travis McEwen was a National Rifle Association member.  After his membership lapsed, the NRA reached out to him, using professional telemarketer InfoCision, to see if he would renew his membership.  He did not.  Instead, McEwen sued the NRA and InfoCision under the Telephone Consumer Protection Act, known as the TCPA.

This is McEwen's second attempt at a Complaint.  It does not change the appropriate result:  McEwen's do-not-call theory should be dismissed, and his claim that InfoCision used an "automatic telephone dialing system" or "ATDS" to call him should be stayed pending the Supreme Court's decision on that issue.  Briefing on the motion to stay is complete.  (*See* Dkt. Nos. 17 at pp. 5-10, 25, & 28.)  This motion addresses McEwen's attempt to fix the do-not-call theory.

McEwen's cell phone number is listed on the National Do Not Call Registry.  (Dkt. No. 1 ("Compl.") ¶ 28.)  He argues that this should bar InfoCision and the NRA from calling that number.  (*Id.* ¶¶ 63-71.)  But that TCPA rule does not apply to calls made on behalf of a "tax-exempt nonprofit organization."  The NRA is a well-known 501(c)(4) tax-exempt nonprofit, and Defendants' first motion to dismiss pointed out this flaw in McEwen's theory.  (*See* Dkt. No. 17, p. 2-3.)

McEwen did not oppose that motion and filed an Amended Complaint acknowledging the issue.  (*See* Dkt. No. 24 ("Am. Compl.") ¶ 52 ("The TCPA exempts calls 'by a tax exempt nonprofit organization.'").)  But instead of dropping the theory, McEwen expanded it, adding two more do-not-call claims.  (*Id.* ¶¶ 87-98.)

McEwen seeks to avoid dismissal in two ways.  First, he argues that the IRS is wrong, and that the NRA—despite its nearly 150-year history as a nonprofit organization—is actually a for-profit entity.  But an entity's status under the Internal

Revenue Code as a tax-exempt nonprofit controls.  Second, McEwen alleges that InfoCision makes calls on behalf of other, albeit unspecified, entities, too.  But McEwen identifies no facts about any of these calls that would plausibly support a do-not-call violation.  McEwen's Amended Complaint thus fails to state a do-not-call violation for the same reason as the first:  he identifies only calls made on behalf of a tax-exempt nonprofit organization.

That is not the only problem.  Regardless of tax status, the do-not-call rules only apply to calls made "for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services."  47 C.F.R. § 64.1200(f)(12) & (14); *see also id.* § 64.1200(c) & (d).  McEwen alleges that the NRA called him to re-start his NRA membership, not to purchase "property, goods, or services."  (Am. Compl. ¶¶ 2, 16-17, 35, 39.)  These rules also only apply to "residential telephone subscribers," not cell phones.  47 U.S.C. § 227(c)(1); 47 C.F.R. § 64.1200(c) & (d).

For these reasons, the Court should dismiss Counts 3 through 6 with prejudice.

**LAW & ARGUMENT**

## I.    Standard of review.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Mehta v. Ocular Therapeutix, Inc.*, 955 F.3d 194, 205 (1st Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In making that decision, the Court ignores legal conclusions, as well as allegations "so threadbare or speculative that they fail to cross the line between the conclusory and the factual."  *Penalbert-Rosa v. Fortuno-Burset*, 631 F.3d 592, 595 (1st Cir. 2011) (quotation omitted).

## II.      The Court should reject McEwen's "other client" allegations.

McEwen's first Complaint alleged that he received calls made on behalf of the NRA.  There are problems with that theory.  So McEwen seeks to expand the case by alleging that he received "numerous calls from InfoCision on behalf of other entities." (Am. Compl. ¶ 4; *see also id*. ¶¶ 30-33.)  No such entity is identified, and no substantive facts are alleged about any of these calls.

More is required.  The "plausibility standard demands that a party do more than suggest in conclusory terms the existence of questions of fact about the elements of a claim." *Maddox v. Elsevier, Inc.*, 732 F.3d 77, 81 (1st Cir. 2013); *see also Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012) ("plaintiff must still lay out enough facts from which malice might reasonably be inferred"); *Méndez Internet Mgmt. Servs., Inc. v. Banco Santander de Puerto Rico*, 621 F.3d 10, 14 (1st Cir. 2010) (courts must "screen[] out rhetoric masquerading as litigation").

McEwen must allege the basic facts about the calls on which his claim is based. *See Wass v. Amerigroup Texas, Inc.*, 2020 WL 4464361, at *4 (N.D. Tex. Aug. 3, 2020) (dismissing TCPA claim because plaintiff did "not provide substantive factual allegations about the source, time, and frequency of the calls"); *Trumper v. GE Capital Retail Bank*, 79 F. Supp. 3d 511, 513 (D.N.J. 2014) (same).  For example, there is no way to tell from the Amended Complaint whether these other-client calls were "for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services" without knowing the identities of the clients or the purpose of the calls.  47 C.F.R. § 64.1200(f)(12) & (14); *see also id*. § 64.1200(c) & (d).

A comparison of McEwen's allegations detailing InfoCision's calls on behalf of the NRA is telling.  *See Maddox*, 732 F.3d at 81 ("paucity of factual content bearing on

causation is made painfully apparent by a comparison [to] the complaint's allegations of fraudulent conduct"). For the NRA calls, McEwen not only identifies the client, but also the purpose (membership solicitation) and general timing. (Am. Compl. ¶¶ 16-29, 35-36, 39-40.) He also details the single phone call he remembers answering in several paragraphs. (*Id.* ¶¶ 41-48.) In contrast, McEwen alleges only that he received "numerous calls from InfoCision on behalf of other entities"—without saying who or what the calls were about. (Am. Compl. ¶ 4; *see also id.* ¶¶ 30-33.)

McEwen may say that he will learn more in discovery. But this "argument, of course, puts the cart before the horse." *Levey v. Brownstone Inv. Grp., LLC*, 590 F. App'x 132, 137 (3d Cir. 2014). Even before *Twombly* and *Iqbal*, "the price of entry, even to discovery, [was] for the plaintiff to allege a *factual* predicate concrete enough to warrant further proceedings, which may be costly and burdensome." *DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999) (emphasis in original). Stated differently, "a plaintiff whose complaint does not state an actionable claim has no license to embark on a fishing expedition in an effort to discover a cause of action." *Artuso v. Vertex Pharm., Inc.*, 637 F.3d 1, 8 (1st Cir. 2011).

The Court should analyze McEwen's allegations related to the NRA to determine whether he states a claim. As one District Court recently observed, "it is not too much to ask that a plaintiff who was so frustrated over persistent calls from the same number to have contacted a lawyer actually recall and set down in a pleading the details of the interactions that led her to bring a federal case." *Perez v. Quicken Loans, Inc.*, 2020 WL 1491145, at *3 (N.D. Ill. Mar. 27, 2020) (granting motion to dismiss TCPA claim).

### III.     McEwen's do-not-call claims should be dismissed.

Counts 3 and 4 allege that InfoCision and the NRA violated the ban on calling

phone numbers listed on the National Do Not Call Registry.  (Am. Compl. ¶¶ 79-81, 83.)

Counts 5 and 6 allege that InfoCision and the NRA violated the ban on calling numbers

listed on an entity-specific do-not-call list.  (*Id.* ¶¶ 88, 94.)  All four claims fail for three,

independent reasons: (1) the NRA is a "tax-exempt nonprofit organization"; (2)

Defendants did not call McEwen to sell "property, goods, or services"; and (3)

Defendants did not call a "residential telephone."

### A.     The NRA is a "tax-exempt nonprofit organization."

The do-not-call rules do not apply to calls made on behalf of a tax-exempt

nonprofit organization.  The ban on calling "[a] residential telephone subscriber who

has registered his or her telephone number on the national do-not-call registry" only

applies to "any telephone solicitation."  47 C.F.R. § 64.1200(c)(2).  The "term telephone

solicitation . . . does not include a call or message . . . [b]y or on behalf of a tax-exempt

nonprofit organization."  47 C.F.R. § 64.1200(f)(14)(iii); 47 U.S.C. § 227(a)(4).  The

entity-specific rules similarly state that "[t]ax-exempt nonprofit organizations are not

required to comply[.]"  47 C.F.R. § 64.1200(d)(7); *see also* Rules and Regulations

Implementing the TCPA of 1991, 18 F.C.C. Rcd. 14014, 14040 & 14044 (2003) (rules do

not apply to "tax-exempt nonprofit organizations or entities that telemarket on" their

behalf); *see also id.* at 14070 (same for "the company-specific requirements").

McEwen does not dispute that the NRA is a 501(c)(4) entity organized as a New

York nonprofit.  (Am. Compl. ¶¶ 53-54.)  Under the Internal Revenue Code, a 501(c)(4)

entity is tax-exempt because the IRS has determined that the entity is "not organized for

profit."  26 U.S.C. § 501(a) & (c)(4)(A).  This should end the inquiry.  *See Spiegel v.*

*Reynolds*, 2016 WL 6877625, at *6 n.13 (N.D. Ill. Nov. 22, 2016) (rejecting plaintiff's request in TCPA case for "the Court to entirely disregard the IRS's designation" and finding 501(c)(3) status dispositive), *aff'd* 733 F. App'x 311 (7th Cir. 2018); *Fitzhenry v. Indep. Order of Foresters*, 2015 WL 3711287, at *2 (D.S.C. June 15, 2015) (501(c)(8) fraternal benefit association was tax-exempt nonprofit); *Ashland Hosp. Corp. v. Serv. Emps. Int'l Union* 708 F.3d 737, 745 (6th Cir. 2013) (same for 501(c)(5) organization).

McEwen relies on *Zimmerman v. Cambridge Credit Counseling Corp.*, 409 F.3d 473 (1st Cir. 2005) to support his challenge to the IRS's long-held view that the NRA is a tax-exempt nonprofit organization.  (Am. Compl. ¶ 57.)  In *Zimmerman*, the First Circuit addressed the meaning of an exemption from the Credit Repair Organizations Act (CROA), which provides that the term "'credit repair organization' . . . does not include any nonprofit organization which is exempt from taxation under section 501(c)(3) of Title 26."  409 F.3d at 475 (quoting 15 U.S.C. § 1679a(3)(B)(i)).  Based on this language, the First Circuit held that "to be excluded from the CROA under 15 U.S.C. § 1679a(3)(B)(i), a credit repair organization must actually operate as a nonprofit organization *and* be exempt from taxation under section 501(c)(3)."  *Zimmerman*, 409 F.3d at 478 (emphasis in original).  While the IRS's determination addressed the latter requirement, a plaintiff suing under the CROA may challenge the entity's nonprofit status based on the "standard definition of the term."  *Id.*

*Zimmerman* does not apply here.  Using "the traditional tools of statutory construction, including a consideration of the language, structure, purpose, and history of the statute," *United States v. Gordon*, 875 F.3d 26, 33 (1st Cir. 2017) (quotation omitted), the Court should hold that "tax-exempt nonprofit" means an organization designated as tax exempt by the IRS because it is organized as a nonprofit.

### 1.  The statutory text.

The TCPA, enacted in 1991, states: "The term 'telephone solicitation' . . . does not include a call or message . . . by a tax exempt nonprofit organization."  Pub. L. 102-243, Sec. 3(a), § 227(a)(3), currently codified at 47 U.S.C. § 227(a)(4).  The FCC's regulations use this same phrase—"tax-exempt nonprofit organization"—to delineate which rules apply to which calls in a variety of places, including the do-not-call rules.  *See* 47 C.F.R. § 64.1200(a)(2), (a)(3)(iv), (a)(7)(iv), (d)(7), (f)(14).

McEwen seeks to pull "nonprofit" out of this phrase and interpret it in isolation. This argument overlooks the "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used."  *Deal v. United States*, 508 U.S. 129, 132 (1993).  In the TCPA, Congress wrote "a tax exempt nonprofit organization," using "tax exempt nonprofit" to identify "a" single type of "organization":  one that the IRS has given tax-exempt status because it is a nonprofit.

Congress did not, as it did in the CROA, identify "a large group of entities for the exclusion—all nonprofit organizations—and then limit[] the excluded group to a smaller group of nonprofit organizations 'which are tax-exempt under section 501(c)(3).'" *Zimmerman*, 409 F.3d at 475.  That the language of the CROA separated the two requirements is evident from the way that the parties and the First Circuit framed the issue:  whether "501(c)(3) status" "*defines*" the term "nonprofit organization."  *Id.* (emphasis added).  The First Circuit pointed out that the surrounding language of the CROA and other statutes showed that it did not.  *Id.* at 475-76.  Where Congress intends to define a term, it says so.  *Id.* (noting that the surrounding text used "as defined in"

and other statues use similar definitional language such as "means," 16 U.S.C. § 1447a(5), or "is," 42 U.S.C. § 1485(w)(1)).

The issue here is not how to define the term "nonprofit," but how to identify the group of organizations Congress referred when it used the phrase "tax exempt nonprofit." The "most natural reading of this text" is to identify organizations that are tax exempt under the IRS's rules for nonprofit organizations. *Id.* at 475

This reading is particularly appropriate considering the routine use by the IRS and others of the phrase "tax-exempt nonprofit" to identify 501(c) organizations. *See, e.g.*, I.R.S. P.L.R. 7837041 (June 15, 1978), 1978 WL 46063 ("tax-exempt nonprofit"); I.R.S. P.L.R. 9447013 (Nov. 25, 1994), 1994 WL 659729 (same); *Zeidler v. Comm'r*, 71 T.C.M. (CCH) 2603, 1996 WL 135692 at *2 (T.C. 1996) (using "tax-exempt nonprofit organization" to describe organizations that are listed "on the U.S. Department of Treasury Cumulative List of organizations pursuant to section 501(c)"); *Carpenter v. Comm'r*, 103 T.C.M. (CCH) 1001, 2012 WL 10798 at *1 (T.C. 2012) (describing organization registered under § 501(c) as "a tax-exempt nonprofit organization"); *Corp. of Pres. Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 330 n.3 (1987) (same); *United States v. Greenpeace, Inc.*, 314 F. Supp. 2d 1252, 1262 (S.D. Fla. 2004) (501(c)(4) is "a tax-exempt non-profit").

As the Supreme Court has held, "where a phrase in a statute appears to have become a term of art . . . any attempt to break down the term into its constituent words is not apt to illuminate its meaning." *Sullivan v. Stroop*, 496 U.S. 478, 483 (1990); *see also Neder v. United States*, 527 U.S. 1, 22 (1999) ("[W]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense" (quotation omitted)).

Congress's use of the phrase elsewhere in 47 U.S.C. § 227 further disproves McEwen's desired reading.  In 2005, Congress amended the TCPA to add several provisions related to unsolicited faxes.  *See* Pub. L. 109-21, 119 Stat. 359 (2005). Congress allowed the FCC to exempt "professional or trade associations that are tax-exempt nonprofit organizations" from the opt-out notice requirement for "unsolicited advertisements to their members in furtherance of the association's *tax-exempt purpose*."  47 U.S.C.A. § 227(b)(2)(F) (emphasis added).  Congress's use of "tax-exempt purpose" points to § 501(c).  *See Sorenson v. Sec'y of Treasury of U.S.*, 475 U.S. 851, 860 (1986) ("identical words used in different parts of the same act are intended to have the same meaning") (quotation omitted).

### 2.    The TCPA's structure.

"It has been called a golden rule of statutory interpretation that unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result."  *Kelly v. United States*, 924 F.2d 355, 361 (1st Cir. 1991) (quotation omitted); *see also Gordon*, 875 F.3d at 35-36 ("When faced with a wooden reading of a statute that would produce a result that conflicts with the clear congressional purpose animating that statute, a reviewing court ought to be open to adopting a textually plausible alternative reading that would produce a more sensible result.").  For this reason, "the practical consequences of a given interpretation can help inform an inquiry into congressional intent."  *Vooys v. Bentley*, 901 F.3d 172, 192 (3d Cir. 2018).

The practical consequence of interpreting "tax-exempt nonprofit" as McEwen requests would be to potentially subject tax-exempt nonprofit organizations and their

professional fundraisers to crushing liability, which in turn could shut off tax-exempt nonprofits' ability to fundraise, contrary to Congressional intent.

The TCPA, along with its implementing regulations, is a complicated scheme that regulates the way that organizations may contact people. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 383 (2012) (in the TCPA, Congress "enacted detailed, uniform, federal substantive prescriptions and provided for a regulatory regime administered by a federal agency"). Determining whether an entity is a "tax exempt nonprofit" determines which rules apply to calls by or on behalf of that entity. Some rules, like the do-not-call rules, do not apply. Other rules, like the prohibition on using a prerecorded voice or ATDS, may apply differently.

For example, tax-exempt nonprofit organizations need only have "express consent" to use a prerecorded voice or ATDS as opposed to the "express *written* consent" that most everyone else must have. 47 C.F.R. § 64.1200(a)(2). Tax-exempt nonprofits may call residential lines using a prerecorded voice; other entities may not. 47 C.F.R. § 64.1200(a)(3). Certain procedural rules also apply differently depending on whether a call is by or on behalf of a tax-exempt nonprofit. *See* 47 C.F.R. § 64.1200(a)(7) (abandonment rules); 47 C.F.R. § 64.1601(e)(3) (caller ID rules).

Given this complexity, clarity is important so that the regulated entities can follow the law. *See* Rules and Regulations Implementing the TCPA of 1991, 68 FR 44144-01 ¶ 5 (2003) ("We agree with Congress that consistency in the underlying regulations and administration of the national do-not-call registry is essential to avoid consumer confusion and regulatory uncertainty in the telemarketing industry."). This is particularly true in the context of telemarketing rules, given the predictably widespread use of expert contractors like InfoCision, who have little insight into their clients'

internal operations.  As the FCC recognized in adopting its rules: "charitable and other nonprofit entities with limited expertise, resources and infrastructure, might find it advantageous to contract out [their] fundraising efforts."  *Id*. ¶ 93.  And many do.  *See* Rules and Regulations Implementing the TCPA of 1991, 10 F.C.C. Rcd. 12391 ¶ 12 (1995) (comments discussing "calls placed by tax-exempt nonprofit organizations, but also calls made on their behalf by independent telemarketers").

Those organizations must be able to determine what rules apply when making calls on behalf of their clients.  Presently, this is straightforward: the IRS keeps a list of tax-exempt nonprofits and these entities must file returns each year that are publicly available.[1]  But if McEwen's proposed interpretation is accepted, then any time someone thinks an entity's salaries are too high, class-action litigation will ensue against both the entity and the professional telemarketer with millions—if not billions—on the line.

These stakes make it unlikely that tax-exempt nonprofits and their professional fundraisers would be willing to risk calling under the tax-exempt nonprofit rules unless they can rely on the IRS's determination of their status, which in turn would eviscerate the more lenient treatment for these entities that Congress intended.  *See* H.R. Rep. No. 102-317, at 16 (1991), 1991 WL 245201 (Congress made "public policy determination to exclude calls made by charitable or political organizations").

These implications stand in sharp contrast to *Zimmerman*.  The First Circuit addressed a statute that created "a cause of action for consumers harmed by the unscrupulous business and advertising practices on the part of credit repair

---

[1] Defendants attached the NRA's most recent 990 and incorporation status to the first motion to dismiss, Dkt. Nos. 17-1 & 2, and the IRS's list is available here: Tax Exempt Organization Search, IRS, https://apps.irs.gov/app/eos/ (last visited 9/25/2020).

organizations." *Zimmerman*, 409 F.3d at 473-74.  But nonprofit organizations were immune from suit.  *Id.*  The First Circuit's interpretation merely added an element to a CROA claim.  It did not throw confusion on what rules apply to an entire industry, as McEwen asks the Court to do here.

Moreover, the First Circuit's decision was influenced by the abuse that was happening in the credit repair industry.  *Id.* at 475-77.  After the CROA was passed in 1996 to address the problems in the credit repair industry, unscrupulous organizations started securing 501(c)(3) status and abusing it.  *Id.*  This is exactly what the defendant did in *Zimmerman*.  *See Zimmerman v. Cambridge Credit Counseling Corp.*, 529 F. Supp. 2d 254, 277-78 & n.23 (D. Mass. 2008) (detailing facts and noting that the defendant did "not oppose the contention that the nonprofit exception does not apply").  By the time of the decision in 2005, "Congress [had] held hearings on the abuse of tax-exempt status by credit counseling and repair organizations," and the IRS had initiated a "review the granting of tax-exempt status in this industry."  409 F.3d at 477 n.7.

There is no similar industrywide abuse of the TCPA tax-exempt nonprofit rules, and McEwen alleges no such thing here.  To the contrary, the NRA has been organized as a nonprofit entity since 1871—120 years before the TCPA was enacted and 5 years before Alexander Graham Bell received his first patent for the telephone.  And the IRS has consistently categorized the NRA as a tax-exempt nonprofit organization.  The Court should dismiss Counts 3 through 6.

### B. McEwen did not receive a "telephone solicitation" or a call made for "telemarketing purposes."

Even if McEwen could challenge the NRA's tax-exempt nonprofit status, his claims would still fail because he does not allege that Defendants called him "for the

purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(c)(2) & (f)(14) (National Do Not Call Registry claim applies to "telephone solicitations"); *id* § 64.1200(d)(6) & (f)(12) (entity-specific list applies to "telemarketing," using the same definition).

McEwen alleges that InfoCision called him on behalf of the NRA to request that he re-join.  (Am. Compl. ¶ 39.)  An NRA membership is not "property," nor is it a "good" or "service."  Rather, the NRA "solicits and collects membership fees to further its work in firearms advocacy, training, and education[.]"  (*Id.* ¶ 16.)[2]

Seeking money to further a political or charitable mission is not selling property, goods, or services.  The phrase "property, goods, or services" denotes "commercial sales calls."  *Mainstream Mktg. Servs., Inc. v. F.T.C.*, 358 F.3d 1228, 1233 (10th Cir. 2004).  In other words, the "restrictions apply only to telemarketing calls made by or on behalf of sellers of goods or services, and not to charitable or political fundraising calls."  *Id.* at 1234.

The NRA is an advocacy organization that funds its activities through donations and memberships.  Soliciting contributions for this purpose was why InfoCision called McEwen on the NRA's behalf.  These calls were not telephone solicitations.

For example, the district court in *Spiegel v. Reynolds* held that calls soliciting donations to the Breast Cancer Society were not "telephone solicitations."  2017 WL 4535951, at *4 (N.D. Ill. Oct. 11, 2017).  The court rejected the plaintiff's proposed "expansive interpretation" that would capture calls that ask for "money that

---

[2] The NRA vigorously disputes the New York Attorney General's allegations that McEwen copied in his Complaint.  *See NRA v. Letitia James*, N.D.N.Y. Case No. 1:20-cv-00889-MAD-TWD.  Regardless, McEwen's copy-cat allegations do not affect the calls' purpose, which are to sell NRA memberships, not "property, goods, or services."

will *eventually* be used to purchase goods or services for someone else."  *Id.* (emphasis in original); *see also All One God Faith, Inc. v. Organic & Sust. Indus. Stand., Inc.*, 183 Cal. App. 4th 1186, 1212 (2010) ("nonprofit trade association [which] acts on its members' behalf" is not "primarily engaged in the business of selling or leasing goods or services"); *cf. Suttles v. Facebook, Inc.*, 2020 WL 2763383, at *3 (W.D. Tex. May 20, 2020) ("By alleging that Facebook sent Suttles text messages merely to help the company engage in commercial transactions with *others* . . ., he admits that Facebook was not soliciting *him*, as is required[.]") (emphasis in original).

The FCC agrees.  In adopting the do-not-call rules, the FCC explained that "political or religious speech calls" would not fall within the definition of "telephone solicitation."  18 F.C.C. Rcd. 14014, 14040 (2003); *see also id.* at 14143 n.414 (same). The FCC reaffirmed this three years later when explaining the term "unsolicited advertisement"—defined similarly to mean "material advertising the commercial availability or quality of any property, goods, or services."  47 C.F.R. § 64.1200(f)(15). The agency explained:  "We clarify that messages that do not promote a commercial product or service, including all messages involving political or religious discourse, such as a request for a donation to a political campaign, political action committee or charitable organization, are not unsolicited advertisements under the TCPA."  Junk Prevention Act of 2005, 21 F.C.C. Rcd. 3787, 3810 (2006).

McEwen notes that memberships come with certain benefits and may rely on *Kalmbach v. NRA*, 2017 WL 3172836 (W.D. Wash. July 26, 2017).  The Court should not follow *Kalmbach*.  Not only is *Kalmbach* not a TCPA case, but contrary to that court's rationale, the Amended Complaint and the NRA's website on which McEwen relies make clear that members are provided free gifts with their memberships.  (Am. Compl.

¶ 24.)  The website explains: "As an NRA member, you'll get an official NRA membership card, a free NRA decal, and a free subscription to one of the NRA's award-winning magazines."  NRA, https://membership.nra.org/FAQ (last visited 9/25/2020). In contrast, the NRA has an online store that is open to the public to purchase NRA-branded merchandise.  *See* The Official NRA Store, https://nrastore.com/ (last visited 9/25/2020).  But McEwen does not allege the calls to him even mentioned the NRA store, let alone solicited him to purchase goods from it.

Many political and charitable organizations provide free gifts and other benefits to their donors or members as part of fundraising activity.[3]  But "the fact that a political message contains an offer to attend a fundraising dinner or to purchase some other product or service in connection with a political campaign or committee fundraiser does not turn the message into an advertisement[.]"  21 F.C.C. Rcd. 3787, 3810 n.157 (2006). Even in the commercial context, a district court determined that calls from a health insurance company to its members informing them of free benefits available at no extra cost were not telephone solicitations.  *Morris v. Unitedhealthcare Ins. Co.*, 2016 WL 7115973, at *8 (E.D. Tex. Nov. 9, 2016).

The NRA is no more selling magazines than a political candidate is selling a steak dinner, or a charity is selling a t-shirt.  In each case, these are free gifts that are provided as a thank you for making a political or charitable contribution.  Counts 3 through 6 should be dismissed because McEwen was not called "for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services."

---

[3] *E.g.*, Sierra Club, https://bit.ly/3j9f5wI (last visited 9/28/2020); Human Rights Campaign, https://www.hrc.org/get-involved/memberships (last visited 9/28/2020); World Wildlife Fund, https://bit.ly/3cEVzG0 (last visited 9/28/2020).

### C.      Defendants did not call a "residential telephone."

The TCPA directed the FCC to adopt rules to "protect *residential telephone subscribers'* privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1) (emphasis added). Congress authorized the FCC to establish and operate a "single national database to compile a list of telephone numbers of *residential subscribers* who object to receiving telephone solicitations." 47 U.S.C. § 227(c)(3) (emphasis added). In response to this statutory authority, the FCC enacted the do-not-call rules, which it stated apply to "residential telephone subscribers." 47 C.F.R. § 64.1200(c)(2); *id* § 64.1200(d).

The TCPA does not define "residential telephone subscriber" or "residential subscribers." McEwen alleges that InfoCision called his "cell phone." (Am. Compl. ¶ 34.) Nowhere does he even offer the legal conclusion that his "cell phone" is a "residential telephone." While the Court should hold that cell phones categorically do not qualify, at a minimum McEwen's present pleading does not suffice.

### 1.      Cell phones are not residential phones.

"The definition of residential is 'used as a residence or by residents,' and 'resident' is defined as 'living in a place for some length of time,' or 'one who resides in a place.'" *Shelton v. Fast Advance Funding, LLC*, 378 F. Supp. 3d 356, 362 n.7 (E.D. Pa. 2019) (quoting Merriam Webster). As the district court in *Shelton* noted, "the plain language of 'residential telephone' describes a telephone used by individuals in the home, and not a cellular telephone, which can be used anywhere." *Id.*

The TCPA also expressly distinguishes "residential telephone" from "cellular telephone." *Compare* 47 U.S.C. § 227(b)(1)(A)(iii) *with id.* § 227(b)(1)(B). "Where Congress uses certain language in one part of a statute and different language in

16

another, it is generally presumed that Congress acts intentionally." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012).  And "a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute." *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006).

Based on this common understanding of a "residential telephone" versus a "cellular telephone," the Court should conclude that cell phones do not fall within the statutory definition of the term.  *See, e.g.*, *Cunningham v. Lines*, 2016 WL 7494871, at *2 (S.D. Fla. Dec. 29, 2016) ("Plaintiff concedes that all telephone calls at issue were made to his cellular telephone number, and the Court finds Plaintiff's assertion that a cellular phone can be converted into a residential phone unavailing.").

The FCC, however, takes a broader view.  In 47 C.F.R. § 64.1200(e), the FCC incorporated its discussion of the matter in "CG Docket No. 02–278, FCC 03–153," which is at 18 F.C.C. Rcd. 14014, 14038–39 (2003).  There, the FCC rejected a categorical approach, and stated that a "wireless subscriber" may be a "residential subscriber" based on a "fact-intensive" inquiry.

The Court should reject this view because the statute's unambiguous text contradicts the FCC's interpretation.  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2124-25 (2016) (if "Congress has directly spoken to the precise question at issue," then "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress") (quotation omitted); *see also Sandusky Wellness Ctr., LLC v. Medco Health Sols., Inc.*, 788 F.3d 218, 223 (6th Cir. 2015) ("where our construction follows from the unambiguous terms of the statute—as it does here—we do not defer to the agency's interpretation") (quotation omitted).

McEwen may cite the Hobbs Act as barring the Court from doing so.  That reliance would be misplaced.  The Hobbs Act provides:  "The court of appeals . . . has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of (1) all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47."  28 U.S.C. § 2342.  Any "aggrieved party" must challenge a final order "within 60 days after its entry . . . in the court of appeals wherein venue lies."  28 U.S.C. § 2344.  Several courts have interpreted this language to bar district courts from questioning the FCC's interpretations of the TCPA.  *E.g.*, *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 883 F.3d 459, 465 (4th Cir.), *cert. granted in part*, 139 S. Ct. 478 (2018), *and vacated*, 139 S. Ct. 2051 (2019).

In *PDR Network*, the Supreme Court reviewed, and vacated, the Fourth Circuit's conclusion that the "district court had no power to decide whether the FCC rule was entitled to deference" under the Hobbs Act.  883 F.3d at 464.  The majority opinion did not address the underlying question, and instead sent the case back to the Fourth Circuit for it to consider two preliminary questions.  139 S. Ct. at 2055-56.

Justice Kavanaugh wrote for a four-judge concurrence and explained why district courts are not bound by the FCC's interpretation in as-applied enforcement actions.  *Id.* at 2057-67.  The Hobbs Act is silent regarding "whether a party may argue against the agency's legal interpretation in subsequent enforcement proceedings."  139 S. Ct. at 2059-2060.  And "elementary principles of administrative law establish that the proper default rule is to allow review by the district court of whether the agency interpretation is correct."  *Id.* at 2060.  Judge Pryor of the Eleventh Circuit recently authored a detailed opinion concurring in this reasoning.  *Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1106-12 (11th Cir. 2019) (Pryor, J., concurring).

18

As one court put it, "this is not a case in which this court has been asked to 'enjoin, set aside, suspend (in whole or in part), or to determine the validity of' any FCC orders. Rather, this is a dispute between private parties in which the parties cited FCC interpretations of Congressional statutes[.]" *Crown Castle NG E. LLC v. Town of Hempstead*, 2019 WL 5188923, at *4 (E.D.N.Y. Oct. 15, 2019).

The First Circuit has not addressed whether the Hobbs Act bars district courts from determining whether to defer to FCC interpretations of the TCPA or other statutes it administers.[4]  In one case, the First Circuit rejected a "collateral attack" on an Interstate Commerce Commission (ICC) order under the Hobbs Act.  *See Bhd. of Locomotive Eng'rs v. Bos. & Maine Corp.*, 788 F.2d 794, 796 (1st Cir. 1986).  But there, the party challenging the order was involved in the underlying ICC proceeding.  *Id.* at 800.  Nor was the issue whether an interpretation of federal law was correct; the party asked for an order to be "reversed" because the agency did not supply a "reasoned basis" for its ruling, which exempted the defendant from regulations that the union sought to enforce.  *Id.* at 801.  This case thus does not control whether the Hobbs Act requires district courts to defer to FCC interpretations in as-applied enforcement actions.

Based on Justice Kavanaugh's analysis, the proper course based on the plain language of the Hobbs Act and Supreme Court precedent is to apply the usual rules of deference when the FCC's interpretation of the TCPA is cited in litigation among private parties.  Because "residential telephone" is unambiguous in the TCPA, the FCC's interpretation is owed no deference.

---

[4] In *Breda v. Cellco P'ship*, 934 F.3d 1, 13 n. 20 (1st Cir. 2019), the First Circuit took note of the *PDR Network* decision but had no occasion to apply it.  A district court in this circuit applied the pre-*PDR Network* prevailing view with little analysis.  *See In re Collecto, Inc.*, 2016 WL 552459, at *2 (D. Mass. Feb. 10, 2016).

### 2. McEwen's allegations fall short even if some cell phones may be deemed residential phones.

McEwen alleges no facts regarding how he uses his cell phone—not even the legal conclusion that he uses it as a residential phone.  While the FCC initially presumes that a number registered on the registry is residential, more is required to plead this element of McEwen's claim.  18 F.C.C. Rcd. 14014, 14039 (2003) (noting more than registration may be required in an enforcement action); *see also Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187, 1201 (M.D. Tenn. 2017) (dismissing claim because plaintiff had "pled no facts sufficient for this Court to draw" the conclusion that a cell phone was used as a residential phone); *Strange v. Doe #1*, 2020 WL 2476545, at *3 (W.D. La. May 12, 2020) (same); *Wass*, 2020 WL 4464361, at *5 (same).

### CONCLUSION

Counts 3 through 6 should be dismissed with prejudice.

Dated:  September 28, 2020

Respectfully submitted,

/s/ Patrick Strawbridge
Patrick Strawbridge
Maine Bar No. 10024
Consovoy McCarthy PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

Terry M. Brennan (pro hac vice)
Sam A. Camardo (pro hac vice)
Daniel M. Kavouras (pro hac vice)
BakerHostetler LLP
127 Public Square, Suite 2000
Cleveland, OH 44114
T (216) 861-7145
F (216) 696-0740
tbrennan@bakerlaw.com
scamardo@bakerlaw.com
dkavouras@bakerlaw.com

*Attorneys for Defendants*