UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| TRAVIS MCEWEN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No. 2:20-cv-00153-LEW |
| | ) | |
| NATIONAL RIFLE ASSOCIATION | ) | |
| OF AMERICA and  INFOCISION, | ) | |
| INC., d/b/a INFOCISION | ) | |
| MANAGEMENT CORPORATION, | ) | |
| | ) | |
| Defendants | ) | |

## MEMORANDUM OF DECISION AND ORDER ON
## DEFENDANTS' MOTION TO DISMISS AND MOTION FOR STAY

This case arises under the Telephone Consumer Protection Act. The matter is before the Court on Defendant InfoCision's[1] Motion to Dismiss Counts 3 through 6 of Plaintiff's First Amended Class Action Complaint (ECF No. 31) and a Motion to Stay Counts 1 and 2 (ECF No. 17). For reasons that follow, the request for dismissal of Counts 3 through 6 is granted and the request for stay as to Counts 1 and 2 is dismissed as moot.

### STANDARD OF REVIEW

To avoid dismissal, Mr. McEwen must provide "a short and plain statement of the claim showing he is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Practically speaking, this means the complaint must provide "enough facts to state a claim to relief that is plausible

---

[1] On January 21, 2021, Defendant National Rifle Association ("NRA") filed a suggestion of bankruptcy, resulting in a stay of all proceedings against the NRA. The matter continues now exclusively between Plaintiff Travis McEwen and Defendant InfoCision.

on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In applying this standard, the Court will accept factual allegations as true and consider whether the facts, along with reasonable inferences that may arise from them, describe a plausible, as opposed to merely conceivable, claim. *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011); *Sepúlveda–Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010).

## PROCEDURAL HISTORY AND MATERIAL ALLEGATIONS

Plaintiff Travis McEwen commenced this civil action in May of 2020 by filing his Class Action Complaint ("CAC" – ECF No. 1) containing four counts. After Defendants filed their initial Motion to Dismiss and to Stay (ECF No. 17), Plaintiff filed his First Amended Class Action Complaint ("FACAC" – ECF No. 24) containing six courts. Because the FACAC supersedes the CAC, Defendants filed their Motion to Dismiss Counts 3 through 6 ("Second Motion" – ECF No. 31), which supersedes their prior motion to dismiss, but not the prior request for a stay.

The following allegations are drawn from Plaintiff's Complaints and are recited without judging the allegations for accuracy. Because the matter arises on motions to dismiss, which simply test the sufficiency of the allegations, I accept the allegations as true for the limited purpose of ruling on the motions. Although Plaintiff's FACAC supersedes the CAC, I cite to both pleadings to better illustrate what remains the same and what is new in the FACAC.

The National Rifle Association of America ("the NRA") and InfoCision, Inc., have together created and sustained a telemarketing campaign aimed at selling memberships and soliciting contributions to the NRA. As part of their campaign, Defendants use an

automatic telephone dialing system ("ATDS") to make autodialed calls to consumers without the consumers' consent, including to consumers who have listed their numbers on the National Do Not Call Registry. CAC ¶ 2; FACAC ¶ 2. Some calls, when completed, deliver a prerecorded message. FACAC ¶ 2.

Plaintiff placed his telephone number on the National Do Not Call Registry in 2003 to avoid unsolicited telemarketing calls. Although he once had a membership with the NRA, he let it lapse in 2018 and never consented to automatically dialed calls from the NRA. CAC ¶ 29; FACAC ¶ 35. Nonetheless, he received numerous calls from InfoCision on behalf of the NRA asking him to join the organization. Even after he answered a call and asked for the calls to stop, InfoCision called Plaintiff's number repeatedly. CAC ¶¶ 3, 28; FACAC ¶¶ 4, 34.

In his FACAC, Plaintiff states that in or about 2014 or 2015 he asked InfoCision to place him on their "internal do-not-call list." FACAC ¶ 36.[2] He states that between 2017 and March of 2020 he received "about 66 calls from InfoCision." *Id.* ¶ 37.

Eventually, in March of 2020, Plaintiff answered a call InfoCision placed on behalf of the NRA. When he answered, he had to wait for the ATDS to put him through to one of InfoCision's representatives. During the call, in which Plaintiff once again asked to have his number removed from the system, the representative said words to the effect that the calls were not illegal because the NRA is a nonprofit. At Plaintiff's request, the representative provided the contact information of the NRA and InfoCision. CAC ¶¶ 35-

---

[2] In his CAC, Plaintiff alleged that he first requested that InfoCision place him on its do-not-call list "[a]fter his membership with the NRA expired" in 2018, CAC ¶ 30, and that he asked a second time in November of 2018, CAC ¶ 31.

40; FACAC ¶¶ 41-48. When Plaintiff later called the number that InfoCision used to call his phone, his call was answered by an automated messenger and there was no option to connect to a person. FACAC ¶ 49.

The calls caused Plaintiff to experience aggravation, nuisance, invasion of privacy, and economic injury. CAC ¶ 4; FACAC ¶¶ 5-6.

Plaintiff describes the NRA as, "ostensibly," a membership-based organization that solicits and collects membership fees to further its work in firearms advocacy, training, and education. Plaintiff describes InfoCision as the second largest privately held teleservices company in the United States. The NRA has a contract with InfoCision that instructs or allows InfoCision to make telemarketing calls on behalf of the NRA. CAC ¶¶ 14-17; FACAC ¶¶ 16-19.

Plaintiff states that "the NRA" Defendant is an organization distinct from "the NRA Foundation." According to Plaintiff, the NRA Foundation is registered as a charitable organization under the Internal Revenue Code § 501(c)(3), but "the NRA" is not. CAC ¶ 19; FACAC ¶ 21. Plaintiff states that InfoCision conducts the complained of telemarketing activity on behalf of the NRA and not on behalf of the NRA Foundation. CAC ¶ 20; FACAC ¶ 22.

When InfoCision places calls on behalf of the NRA, it does so using an ATDS that is able to place many calls all at once. When the call is answered, the ATDS can deliver a prerecorded message or patch the consumer through to an InfoCision representative (a new allegation - FACAC ¶ 25). InfoCision regularly places calls to persons who do not have an existing relationship with the NRA and who have never consented to the receipt of

automated calls on the NRA's behalf. InfoCision obtains numbers for its call lists from various sources, including third party vendors, and not exclusively from the NRA's membership records. CAC ¶¶ 23-26; FACAC ¶¶ 25-28.

Through his FACAC, Plaintiff expands his allegations against InfoCision. He claims InfoCision has called him and prospective class members on behalf of unspecified entities other than the NRA, using the same methodologies it employs when it places calls for the NRA. FACAC ¶¶ 3, 4, 20, 30-33.

The FACAC, which is now the operative complaint in this action, recites six counts, or causes of action, as follows:

Count A:    A claim for violation of the TCPA on behalf of persons who received automated telephone calls on their residential telephone lines without their consent.

Count B:    A claim that the TCPA violation asserted in Count A was a willful or knowing violation.

Count C:    A claim for violation of the TCPA on behalf of persons who received calls despite having registered their residential telephone numbers with the National Do-Not-Call Registry (at least two calls in a twelve-month period).

Count D:    A claim that the TCPA violation asserted in Count C was a willful or knowing violation.

Count E:    A claim for violation of the TCPA on behalf of persons who received calls despite having instructed Defendants to honor NRA/InfoCision internal do-not-call lists (at least two calls in a twelve-month period).

Count F:    A claim that the TCPA violation asserted in Count E was a willful or knowing violation.

In exchange for the receipt of membership fees, the NRA provides certain benefits, including gifts and magazine subscriptions. CAC ¶ 22; FACAC ¶ 24.

## DISCUSSION

Through its operative Motion to Dismiss (ECF No. 31), InfoCision targets for dismissal FACAC Counts Three through Six (actually Counts C, D, E, and F), contending these do-not-call claims fail because the NRA is exempt from the FCC's registry-based restrictions due to its nonprofit-organization status and because it does not place calls to solicit sales of goods or services. InfoCision also argues the registry-based claims fail because the calls were made to Plaintiff's cellphone, which does not qualify as a residential telephone. Second Motion at 1-2, 5.

Plaintiff has opposed the motion, Objection to Defendants' Motion to Dismiss (ECF No. 35), and Defendants have submitted their Reply (ECF No. 40). The parties were heard at oral argument on December 11, 2020.

On January 21, 2021, the NRA filed its suggestion of bankruptcy, forestalling my decision on the pending motions. The matter now proceeds exclusively between Plaintiff McEwen and Defendant InfoCision.

### A.    TCPA BACKGROUND

In 1991, Congress enacted the Telephone Consumer Protection Act (TCPA or Act) to provide a bulwark against a tidal wave of telephone solicitations / telemarketing calls, a type of intrusion most Americans, to this day, would rather avoid. *Facebook*, *Inc. v. Duguid*, 141 S. Ct. 1163, 1167 (2021). The Act, Pub. L. No. 102-243, 105 Stat. 2394 (1991), is tucked away in chapter 5, subchapter II, part I of the Communications Act of 1934, now codified at 47 U.S.C. § 227.

In its drafting work, Congress inserted language that prohibited particularly objectionable telemarketing practices: the use of automatic telephone dialing systems ("ATDS")[3] and the delivery of artificial or prerecorded voice messages. *Id.* § 227(b)(1)(A). As to these practices, Congress legislated that telemarketers do not target telephone numbers assigned to a "cellular telephone service," *id.* § 227(b)(1)(A)(iii), and "any residential telephone line," *id.* § 227(b)(1)(B). As to the former, numbers assigned to a cellular phone service, Congress prohibited both the delivery of artificial or prerecorded voice messages and the use of ATDS. As to the latter, residential phone lines, Congress prohibited only the delivery of artificial or prerecorded voice messages.

In addition to enacting "robocall" prohibitions, *Duguid*, 141 S. Ct. at 1167, Congress directed the FCC to initiate rule making proceedings and issue regulations for the specific purpose of "protect[ing] residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." *Id.* § 227(c)(1). Congress also instructed the FCC "consider whether there is a need for additional Commission authority to further restrict telephone solicitations … and, if such a finding is made and supported by the record, propose specific restrictions to the Congress." *Id.* § 227(c)(1)(D).

In time, the FCC promulgated a collection of rules and regulations to further restrict telemarketing practices.[4] Among the rules and regulations are rules related to the National

---

[3] On April 1, 2021, the Supreme Court held that the TCPA's prohibition against the use of an "automatic telephone dialing system" applies to devices that use random or sequential number generators but not to devices that only autodial telephone numbers. *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021) (reversing the Ninth Circuit's opinion that a system capable of automatically dialing stored numbers violates the TCPA).

[4] So too did the Federal Trade Commission. The FTC's authority relates to other legislation designed to curb "abusive telemarketing acts or practices." 15 U.S.C.A. § 6102(a). This action does not arise under this
*(continued next page)*

Do-Not-Call-Registry and rules that require telemarketers to maintain internal do-not-call lists. In these rules, protections are extended to individuals not only with respect to their residential land lines, but also with respect to their personal cellular telephones. *See*, *generally*, 47 C.F.R. Chapter I.B., Part 64, subpart L (Federal Communications Commission's "Restrictions on Telemarketing, Telephone Solicitation, and Facsimile Advertising").

## B. NONPROFIT ORGANIZATION STATUS

The TCPA's definition of "telephone solicitation" excludes "a call or message … by a tax exempt nonprofit organization." 47 U.S.C. § 227(a)(4). Relatedly, the Federal Communications Commission has prohibited certain "telephone solicitations" and/or "telemarketing calls" through regulations entitled "delivery restrictions." 47 C.F.R. § 64.1200. The delivery restrictions do not apply to "a call or message … [b]y or on behalf of a tax-exempt nonprofit organization." *Id.* § 4.1200(f)(14)(iii). InfoCision asks that I dismiss Plaintiff's telemarketing-based claims (Counts C through F) because the NRA is a tax-exempt organization and, therefore, the calls placed by InfoCision on behalf of the NRA were not restricted by the TCPA or the FCC's regulations.

Plaintiff acknowledges in the FACAC that the NRA enjoys "501(c)(4) tax exempt status," but alleges the NRA is not a "nonprofit organization" and exists, chiefly, "to make money for its leaders," who allegedly have diverted "tens of millions of dollars for their

---

related law, the Telemarketing and Consumer Fraud and Abuse Prevention Act, or the FTC's related rules, 16 C.F.R. Chapter I.A., Part 310 (Federal Trade Commission's "telemarketing sales rules"). The ability of private persons to bring civil lawsuits against telemarketers is much more restricted under the Prevention Act. *See* 15 U.S.C. § 6104 (allowing a civil action "if the amount in controversy exceeds the sum or value of $50,000 in actual damages").

personal use," and who receive "grossly excessive salaries and bonuses," resulting in civil litigation instituted by the State of New York "to dissolve the NRA under New York laws governing nonprofit corporations." FACAC ¶¶ 53-55.[5] Plaintiff cites *Zimmerman v. Cambridge Credit Counseling Corporation*, 409 F.3d 473 (1st Cir. 2005), to support the proposition that it is a fact question whether the NRA is "operating as a nonprofit." *Id.* ¶ 57.

*Zimmerman* is persuasive authority that the TCPA's exclusion presents an issue of fact. I say persuasive only because the *Zimmerman* panel did not specifically address the TCPA. The logic employed by the Court, however, applies equally in the TCPA setting notwithstanding the syntactical distinction InfoCision believes I should draw between that decision and this case. In *Zimmerman*, the Court distinguished a statutory exclusion for "any nonprofit organization which is exempt from taxation under section 501(c)(3) of the Internal Revenue Code," 15 U.S.C. § 1679a(3)(B)(i), from another in which the exclusion was defined in such a way as to make the Secretary of the Treasury's determination conclusive of the issue, *i.e.*: a definition stating that "'nonprofit organization' means an organization determined by the Secretary of the Treasury to be an organization described in section 501(c)," 5 U.S.C. § 3102(a)(3). *See Zimmerman*, 409 F.3d at 475-76 (purporting to make a "plain reading" ruling, but also supporting its conclusion based on the maxim that all words should receive meaning and that exclusions in remedial statutes should be

---

[5] Publicly available records indicate that the NRA's alleged abuse of the nonprofit status has also drawn the attention of the Attorney General for the District of Columbia and a request for investigation by the House Ways and Means Committee and House Oversight and Reform Committee. Objection at 13 n.9. On December 10, 2020, Plaintiff filed notice of new factual development (ECF No. 48) involving reports the NRA filed with the IRS concerning significant diversion of assets.

construed narrowly).

Given the taxonomy created in *Zimmerman*, it appears that the TCPA exclusion at issue in this case would likewise call for a finder of fact to determine whether the NRA is, in fact, a "nonprofit organization" entitled to engage in telemarketing without fear of liability based on its alleged disregard of the rules governing do-not-call registries. I am not at liberty to just ignore this precedent and InfoCision has not persuaded me that it has a strong argument for a different outcome here based on the language and structure of the TCPA. [6] The request for dismissal based on the NRA's purported tax-exempt status is denied.

## C.   TELEMARKETING PURPOSE

The TCPA defines "telephone solicitation" to mean "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.C. § 227(a)(4). *See also* 47 C.F.R. § 64.1200(f)(1), (12), (14), (15). InfoCision argues the NRA's fundraising calls do not fit the bill because they constitute fundraising for a political cause rather than "solicitation" of sales, rentals, or investments They argue that a membership in the NRA is not property, that NRA members do not in part purchase goods with their contributions, and that members do not in part expect to receive any services in consideration for their contributions. Second Motion at 12-13. InfoCision argues that its NRA calls are designed to offer membership in a political organization that advocates on its members' behalf and not to sell merchandise.

---

[6] There may be reason to spare a party like InfoCision from liability based on its understanding that it was placing calls for a registered tax-exempt organization, assuming InfoCision had no knowledge of the NRA's alleged corporate misfeasance, but if a legal reason exists the current memorandum associated with the motion to dismiss does not advance the position.

*Id.* at 15. InfoCision also cites an FCC order stating that requests for political action donations that include an offer to purchase a product or service are not considered "advertisements" for the sale of property, goods, and services. *Id.* at 14-15 (citing Report and Order and Third Order on Reconsideration in the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Junk Fax Prevention Act of 2005, 21 F.C.C. Rcd. 3787, 3810 & n.157 (2006)). According to the FCC, even a retail exchange for "the full purchase price … is considered a contribution" when it occurs in the context of political speech calls. *Id.* at 3810 n.157.

Plaintiff argues the standard of review on a motion to dismiss does not allow a legal ruling on the issue, but rather requires the Court to give Plaintiff the benefit of all reasonable inferences. Objection at 15. Concerning available inferences, Plaintiff alleges the NRA tells its members that they cannot treat their membership dues as charitable contributions for income tax purposes because they receive things in exchange, citing the Internal Revenue Code, 26 U.S.C. § 6115. Plaintiff also alleges that an InfoCision representative asked him to pay $150 for a five-year NRA membership in exchange for a limited-edition NRA jersey with a market value of $75 and a magazine subscription. FACAC ¶ 45.

InfoCision's solicitation argument is sound.  Regardless of whether a member of the NRA can deduct a contribution to the NRA, the facts reflect that the member's payment of a membership fee is a contribution to a political organization. Plaintiff has not alleged that he ever received a call in which an InfoCision representative failed to solicit a contribution in exchange for membership in the NRA or offered to sell a product or service in lieu of

membership once Plaintiff declined to pay for membership in the organization. Accordingly, InfoCision's request for dismissal of Counts C through F is granted because the allegations do not state or support a reasonable inference that InfoCision engaged in telephone solicitation during a call with Plaintiff.

## D.   CELLPHONES AS RESIDENTIAL PHONES

Citing statutory language in which Congress directed the FCC to adopt rules to protect the privacy of "residential telephone subscribers," 47 U.S.C. § 227(c), InfoCision argues the do-not-call, registry-related claims should be dismissed because Plaintiff complains about calls he received on his cellular telephone, not a "residential" telephone. Second Motion at 16. InfoCision argues cellphones are not what Congress meant when it spoke of the need to regulate calls to "residential telephone subscribers." This legal proposition has been accepted by some courts and rejected by others.[7]

Congress enacted the TCPA, in part, based on findings related to pervasive telemarketing "to the home" and consumer outrage over "the proliferation of intrusive, nuisance calls to their homes." Pub. L. No. 102-243, 105 Stat. 2394 (1991), § 2(1),(6). Congress also included in the Act an express prohibition against the use of automatic telephone dialing systems or an artificial or prerecorded voice, to include calls placed to "any telephone number assigned to a … cellular telephone service," 47 U.S.C. §

---

[7] Several courts have reasoned that a private remedy is available for calls placed to a personal cellphone used for residential purposes. *See, e.g.*, *Shelton v. Fast Advance Funding, LLC*, 805 Fed. App'x 156, 159 (3d Cir. 2020) (cell phone subscriber has standing to sue under TCPA for do-not-call violation if cell phone is a personal phone not used to conduct business); *Laccinole v. Appriss, Inc.*, 453 F. Supp. 3d 499, 505 & n.7 (D.R.I. 2020) (citing In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014, 14039 (2003) as supportive authority but also citing contrary district court precedent in footnote); *Stevens-Bratton v. TruGreen, Inc*., 437 F. Supp. 3d 648, 658 (W.D. Tenn. 2020); *Rosenberg v. LoanDepot.com LLC*, 435 F. Supp. 3d 308, 324 (D. Mass. 2020).

227(b)(1)(3). Notwithstanding Congress's ATDS-focused treatment of cellphones, the FCC has extended its do-not-call regulations to encompass both residential land lines and personal cellphones.

As InfoCision sees it, the textual distinction Congress made between residential phones and cellphones demonstrates that Congress did not contemplate that a cellphone may also be a residential telephone. The distinction is understandable given that Congress made its findings and passed the TCPA in 1991, when cellphones were not the ubiquitous, multipurpose devices they are now that in many cases have supplanted traditional residential landlines.   But does it really mean that Congress foreclosed the possibility that a cellphone could be a residential telephone and subject to agency rules and regulations protecting consumers' privacy in their homes? Moreover, what am I to make of 47 U.S.C. § 227(c)(1)(D), in which Congress expressed the intention to review any "further" restrictions the FCC might find appropriate to further congressional objectives? The statutory scheme suggests to me that there is an agency authority concern underlying the issue. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 472 (1977) (scope of administrative rule cannot exceed the scope of the power granted by Congress); *FCC v. Am. Broad. Co.*, 347 U.S. 284, 296 (1954) (same); *see also*, *cf. Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 95 (1943) ("[A]n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained.").

InfoCision's textual argument has potential.  I am not inclined to unilaterally update and revise a law passed 30 years ago based on a hunch that Congress would have included

personal cellular phones in its prohibitions had it the power to see into the future.  I may also be reluctant to intuit that Congress intended one thing when the law says another thing. Congressional intent is revealed in the language of the law.  However, that leaves the issue of agency rule making and whether, in this case, it exceeds the scope of the enabling legislation.  I am disinclined to grant InfoCision's request for a dispositive ruling on the cellphone issue for two reasons. First, in the preceding discussion section I have already identified an independent ground for dismissing Counts C through F. Second, if I were to resolve the issue I would first order briefing on what I see as the more fundamental issue; to wit, agency authority to prohibit and thereby make actionable calls placed to cellphone numbers registered in either the national or caller-specific do-not-call registries.  Perhaps between deference to administrative agencies and generously imprecise enabling legislation this is a losing argument for InfoCision but I am not prepared to address it presently.

## E.   INFOCISION CALLS PLACED FOR UNSPECIFIED THIRD PARTIES

In the FACAC, Plaintiff has introduced new allegations and expanded his internal-registry do-not-call claims (Count E and F) by alleging he received unlawful calls that InfoCision placed on behalf of one or more unspecified third parties for an unspecified purpose. InfoCision argues this undeveloped allegation is not enough to raise a plausible claim for relief.  I agree. The claims Plaintiff attempts to advance in Counts E and F based on the freestanding allegation found in paragraph 89 are dismissed for failure to state a non-speculative basis for relief.

## F.   COUNTS A AND B

Although the pending motion does not seek the dismissal of Counts A and B in whole or in part, I am concerned about the impact of *Duguid* on Plaintiff's claims. In Counts A and B, Plaintiff sets forth his claim that InfoCision used an ATDS and prerecorded message when it called him on multiple occasions. After the *Duguid* opinion, the ATDS portion of the claim requires an allegation that InfoCision used a random or sequential number generator to place a call to Plaintiff's cellphone, not merely a claim that its dialing system has that capability. Plaintiff's underlying factual allegations are as follows:

> 42. Like the calls Plaintiff had received before from InfoCision, the March 6, 2020 call was placed by a dialing system that automatically dialed Plaintiff's number.
>
> 43. This dialing system had the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers.

Plaintiff's allegations do not state that InfoCision used a random or sequential number generator to place its calls to Plaintiff.

However, Plaintiff separately supports Counts A and B with allegations that InfoCision placed calls to members of the proposed class in which it delivered a prerecorded voice message. FACAC ¶¶ 25, 28, 32, 69, 73. The prohibition against prerecorded message delivery is a freestanding prohibition that is not limited to telephone solicitation. 47 U.S.C. § 227(b)(1)(A). Yet even this aspect of Counts A and B is problematic, as alleged. Specifically, Plaintiff has not alleged *he* received a call that delivered a prerecorded message. When Plaintiff offers allegations concerning specific calls he received, he states that he heard a pause before a representative joined the call.

FACAC ¶ 44. [8]

For obvious reasons I am concerned whether Plaintiff's allegations state a personal claim and whether Plaintiff has standing to pursue a claim on behalf of the prospective class. However, these concerns will need to await further proceedings because the motion before the Court does not press it, even though the concerns are acknowledged in the parties' papers.

## CONCLUSION

InfoCision's Motion to Dismiss (ECF No. 31) is GRANTED. Counts C, D, E, and F concerning alleged violation of the do-not-call registry rules are DISMISSED on the ground that the allegations do not support a finding that the NRA calls were telephone solicitations prohibited by the TCPA and/or the related FCC rules. Furthermore, Plaintiff's claim concerning telemarketing calls he allegedly received from InfoCision on behalf of unidentified third parties for unidentified purposes is DISMISSED for failure to state a non-speculative basis for relief. InfoCision's Motion to Stay Counts 1 and 2 (ECF No. 17) is DENIED as moot.  Due to the NRA's suggestion of bankruptcy, the matter will proceed on Counts A and B solely against Defendant InfoCision.

---

[8] Plaintiff's FACAC begins with allegations about telemarketing campaigns and states that his rights have been violated. FACAC ¶¶ 2-4. Plaintiff later makes similar assertions about telemarketing practices directed at others, without describing calls he personally received. *Id.* ¶¶ 25-28. 32, 59, 69. When he eventually describes his personal experience, he does not suggest that he heard a prerecorded message and his claim appears to relate entirely to the national do-not-call registry and InfoCision's internal do-not-call registry. *Id.*  ¶¶ 34-51. Furthermore, Plaintiff's number was on file with the NRA because he once was a member, and he does not allege that InfoCision resorted to a random or sequential number generator to reach his cellphone.

**SO ORDERED.**

Dated this 14th day of April, 2021.

_/s/ Lance E. Walker_
UNITED STATES DISTRICT JUDGE